**BAKER & HOSTETLER LLP**
Thomas A. Canova (TC 7270)
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

Deborah A. Wilcox (Ohio Bar No. 0038770)
3200 National City Center
1900 East 9th Street
Cleveland, OH 44114
Telephone: (216) 621-0200
Facsimile: (216) 696-0740

Attorneys for Plaintiff
pediped Infant Footwear, LLC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PEDIPED INFANT FOOTWEAR LLC,<br><br>    Plaintiff,<br><br>    v.<br><br>KUDOS LEATHERGOODS LTD d/b/a JACK AND LILY and ROBERT THOMAS BUELL, Individually,<br><br>    Defendants. | CASE NO. 08-CIV-3572 (LTS)<br><br><br>**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S APPLICATION FOR ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION** |

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ................................................................................................ 1

II.  FACTS ............................................................................................................... 1

    A.  Pediped's Business ................................................................................... 1

    B.  Defendants' Infringing Footwear ............................................................ 3

III.  PEDIPED SATISFIES THE SECOND CIRCUIT'S JACKSON DAIRY
     STANDARD FOR A PRELIMINARY INJUNCTION .................................... 5

    A.  Pediped Is Likely to Succeed on Its Trade Dress Infringement Claims
      (Counts I and V) ....................................................................................... 5

        1.  Pediped's Trade Dress Is Distinctive as to the Source of its
           Footwear ......................................................................................... 6

           a.  Both the Design and the Packaging of Pediped's Shoes
              Have Acquired Secondary Meaning ............................................ 7

                  (1)  Pediped Has Made Substantial Advertising
                      Expenditures ................................................................. 8

                  (2)  Consumer Studies ....................................................... 8

                  (3)  Pediped Has Enjoyed Phenomenal Sales Success ............. 9

                  (4)  Pediped's Footwear Has Been the Subject of
                      Unsolicited Media Coverage ........................................... 10

                  (5)  Competitors Have Attempted to Plagiarize
                      Pediped's Trade Dress .................................................. 11

                  (6)  Pediped Has Used Its Trade Dress Exclusively for a
                      Significant Time ............................................................. 11

             b.  The Packaging of Pediped's Shoes Is Inherently Distinctive ...... 12

             c.  The Design of Pediped's Shoes Is Sufficiently Distinctive
               to Become Recognized as a Mark of Quality .............................. 13

         2.  There Is a Likelihood of Confusion Between Pediped's and
            Defendants' Footwear .................................................................... 14

              a.  Pediped's Trade Dress Is Strong .................................................. 14

              b.  Defendants' Trade Dress Is Highly Similar, If Not
               Identical, to Pediped's Trade Dress ............................................ 14

              c.  Defendants' Footwear Is in Direct Competition with
                Pediped's Footwear ..................................................................... 17

              d.  There Is No Gap to Bridge ........................................................... 17

# TABLE OF CONTENTS
## (continued)

Page

    e.    Actual Confusion Is Likely to Increase Unless Defendants Are Enjoined .................................................................................. 17

    f.    Defendants' Bad Faith Intent to Trade on Pediped's Goodwill Is Plain from Their Slavishly Copied Designs............. 18

    g.    Pediped's Footwear Is of Higher Quality Than Defendants'....... 19

    h.    Pediped's Footwear Is Not So Costly That Consumers Will Exercise Great Care in Making Purchases.................................... 19

    3.    Pediped's Trade Dress Is Nonfunctional ................................................ 20

B.    Defendants' Acts Will Irreparably Harm Pediped Unless Preliminarily Enjoined ............................................................................................................ 22

C.    Pediped Has Shown Serious Questions Going to the Merits and a Balance of Hardships Tipping Decidedly Toward It ........................................................ 24

IV.    CONCLUSION................................................................................................................ 25

## TABLE OF AUTHORITIES

### CASES

*Aedes de Venustas v. Venustas Int'l, LLC,*  No. 07 Civ. 4530 (LTS) (THK), 2007 U.S. Dist. LEXIS 66586 (S.D.N.Y. Sept. 11, 2007)................................................ 14, 17, 19

*Cartier, Inc. v. Four Star Jewelry Creations, Inc.,* 348 F. Supp. 2d 217 (S.D.N.Y. 2004) ........................................................................................................................ 6, 19

*Cartier, Inc. v. Four Star Jewelry Creations, Inc.,* No. 01 Civ 11295, 2003 U.S. Dist. LEXIS 7844 (S.D.N.Y. May 8, 2003)............................................................. passim

*Centaur Commc'ns, Ltd v. A/S/M Commc'ns, Inc.,* 830 F.2d 1217 (2d Cir. 1987)................. 7, 8

*Eliya, Inc. v. Kohl's Dep't Stores,* No. 06 Civ 195 (GEL), 2006 U.S. Dist. LEXIS 66637 (S.D.N.Y. Sept. 13, 2006)................................................................. 6, 11, 20

*Fruit-Ices Corp. v. CoolBrands Int'l Inc.,* 335 F. Supp. 2d 412 (S.D.N.Y. 2004) .... 12, 14, 20, 21

*Fun-Damental Too, Ltd. v. Gemmy Indus. Corp.,* 111 F.3d 993 (2d Cir. 1997) ................ passim

*GMA Accessories, Inc. v. Bop, LLC,* 507 F. Supp. 2d 361 (S.D.N.Y. 2007)...................... 17, 20

*Ideal Toy Corp. v. Chinese Arts & Crafts Inc.,* 530 F. Supp. 375 (S.D.N.Y. 1981)............. passim

*Jackson Dairy, Inc. v. H.P. Hood & Sons,* 596 F.2d 70 (2d Cir. 1979)......................................... 5

*Oral-B Labs., Inc. v. Mi-Lor Corp,* 810 F.2d 20 (2d Cir. 1987)................................................ 18

*Polaroid Corp. v. Polarad Elec. Corp.,* 287 F.2d 492 (2d Cir. 1961) ....................................... 14

*Samara Bros. v. Wal-Mart Stores, Inc.,* 165 F.3d 120 (2d Cir. 1998) ....................................... 18

*Wal-Mart Stores, Inc. v. Samara Bros.,* 529 U.S. 205 (2000) ............................................. 6, 13

## I.    INTRODUCTION

Plaintiff pediped Infant Footwear LLC ("pediped") has established significant goodwill in the marketplace in a distinctive line of children's footwear. That valuable asset is at risk of destruction at the hands of a direct competitor, Defendant Kudos Leathergoods Ltd d/b/a Jack and Lily ("J&L") and its owner and President, Defendant Robert Thomas Buell ("Buell") (J&L and Buell are referenced collectively hereinafter as "Defendants"). Taking a free ride on pediped's efforts and expenditures, Defendants have begun marketing a new line of children's footwear that infringes pediped's trade dress. For the reasons set forth herein, pediped respectfully applies to this Court for an Order to Show Cause why a preliminary injunction should not issue.

## II.    FACTS

### A.    Pediped's Business

In March 2004, Angela and Brian Edgeworth were looking for the perfect soft-soled shoe for their baby daughter. (Decl. of Angela Edgeworth ¶ 2.) They were looking for a shoe design that was more in the style of adult shoes as opposed to a baby booty. (Edgeworth Decl. ¶ 2.) Dissatisfied with the infant footwear industry's offerings, these enterprising parents decided to create their own designs, founding pediped in May 2004. (Edgeworth Decl. ¶ 2.)

Pediped is now one of the fastest growing children's footwear companies in the United States. (Edgeworth Decl. ¶ 4.) Its first line of footwear, known as Originals, consists of children's shoes soled in soft leather and includes more than fifty designs in five sizes. (Edgeworth Decl. ¶ 3, Ex. 1.) Pediped's Originals collection is of an exceptionally high quality. (Edgeworth Decl. ¶ 5.) In February 2008, pediped unveiled a line of rubber-soled shoes for children aged two to five. (Edgeworth Decl. ¶ 3.)

Pediped's soft-soled line features distinctive styling. (Edgeworth Decl. ¶ 6, Ex. 2; Decl. of David Taylor ¶ 5.) The overall look of the design for the line is sophisticated and more adult-like. (Edgeworth Decl. ¶ 7, Ex. 2.) Each shoe features a black sole with highly visible white hand-stitching, which creates a stylized rippled effect around the entire shoe. (Edgeworth Decl. ¶ 8, Ex. 2.) In addition, pediped shoes have a unique and distinctive profile that makes the sole visually small in relation to the upper, creating a clean, streamlined look. (Edgeworth Decl. ¶ 9, Ex. 2.) Also, unlike its competitors, pediped produces shoes that are formed, meaning that they do not fall flat like a sock when not worn. (Edgeworth Decl. ¶ 10.) In part, the signature look of pediped's Originals results from the combination of seven key footwear dimensions that pediped worked hard to perfect. (Edgeworth Decl. ¶ 11.) For pediped's soft-soled line, the tag is placed on the end of the Velcro strap. (Edgeworth Decl. ¶ 12.) Despite variation among particular styles, the overall look makes pediped's Originals a cohesive line. (Edgeworth Decl. ¶ 14.)

Pediped also developed a distinctive form of packaging for its shoes. (Edgeworth Decl. ¶ 15, Ex. 2.) The shoes are packaged in a sturdy, purple, and textured box with a clear plastic window through which the shoes can be viewed. (Edgeworth Decl. ¶ 15, Ex. 2.) The pediped logo and tag line are situated above the plastic window, with the tag line printed in smaller font. (Edgeworth Decl. ¶ 15, Ex. 2.) A description of the product is positioned at the bottom of the box, below the window. (Edgeworth Decl. ¶ 15, Ex. 2.) The left and right sides of the box surrounding the window are of equal proportion to each other and the top portion of the box surrounding the window is more than twice the length of the bottom portion of the box surrounding the window. (Edgeworth Decl. ¶ 15, Ex. 2.) This combination of elements is unique in the children's footwear industry. (Edgeworth Decl. ¶ 15.)

Having enjoyed phenomenal success in the marketplace (Edgeworth Decl. ¶¶ 31-33), pediped's distinctive shoe design and packaging are widely recognized by consumers as identifying pediped's high quality product (Edgeworth Decl. ¶¶ 35-38).

**B.    Defendants' Infringing Footwear**

On March 11, 2008, pediped attended the ENK Children's Club show at the Jacob Javits Center in New York.  (Edgeworth Decl. ¶ 39.)  At that show, several people informed pediped that a competitor was selling a rip-off line of children's shoes.  (Edgeworth Decl. ¶ 39.)  One person even asked whether pediped owned this company.  (Edgeworth Decl. ¶ 39.)

Upon investigation, Pediped discovered that Defendants were selling a new line of children's shoes that copied pediped's soft-soled shoes.  (Edgeworth Decl. ¶ 39.)  Defendants promote their new line on their web site at jackandlily.com, indicating that the line is available April 20, 2008.  (Edgeworth Decl. ¶ 40, Ex. 22.)

Pediped has used a factory in China called Peacebird to manufacture its shoes. (Edgeworth Decl. ¶ 41.)  Pediped has learned from employees at Peacebird that Defendants contacted Peacebird.   (Edgeworth Decl. ¶ 41.)   Pediped believes that Peacebird provided pediped's confidential drawings for its shoe designs to Defendants because Defendants could not have copied pediped's soft-sole shoes with such precision without its shoe last and cutting dies. (Edgeworth Decl. ¶ 41.)

Defendants' new shoe design is indistinguishable from pediped's design.  (Edgeworth Decl. ¶ 42, Exs. 1, 2, 8, 9.)  Defendants offer the identical shoe, in identical proportions, and even the strap is the same.  (Edgeworth Decl. ¶ 42.)  It is beyond coincidence that Defendants' shoes would use the same dimensions for making shoes that pediped does, given the huge number of combinations mathematically available that would still result in appealing children's shoes.  (Edgeworth Decl. ¶ 42.)

3

Beyond copying the exact shoe dimensions, Defendants' shoes copy pediped's distinctive white stitching on black soles, the stylized rippling around the entire shoe, or both. (Edgeworth Decl. ¶ 43.) Defendants also copy pediped's use of a white sewn-in tag on the end of the strap of the shoe. (Edgeworth Decl. ¶ 43.) Defendants' new line of shoes has the same overall look and feel of pediped's shoes. (Edgeworth Decl. ¶ 44.)

Moreover, Defendants' shoes copy even more from many of pediped's better-selling styles, including colors and design features, as detailed in Ms. Edgeworth's declaration. (Edgeworth Decl. ¶¶ 45-51, Exs. 9, 10, 11, 12, 13, 14, 15.) This striking similarity in the face of virtually endless alternative designs, colors, features, and combinations shows that Defendants intentionally copied pediped's product. (Edgeworth Decl. ¶¶ 52-54.) On their website, Defendants even copy the descriptors pediped uses to market its soft-soled shoes. (Edgeworth Decl. ¶ 56, Ex. 19.)

For this new line of shoes, Defendants also copied pediped's distinctive packaging. (Edgeworth Decl. ¶ 57, Ex. 20.) Instead of using the same plastic packaging that they use for their existing line (Edgeworth Decl. Ex. 20), Defendants package their new line in colored boxes with handles, which are the same size and shape as pediped's boxes (Edgeworth Decl. ¶ 57, Ex. 20). Defendants' packaging includes a plastic window of the same size and shape; the same proportions on the front of the box surrounding the window, the left and right sides surrounding the window being of equal proportion to each other and the top surrounding the window being more than twice the length of the bottom surrounding the window; and a logo in the same place above the window, with additional content located beneath the logo in smaller font and below the window. (Edgeworth Decl. ¶ 57, Ex. 20.) Defendants' intent to trade on pediped's goodwill is

undeniably apparent from their obvious copying of several of pediped's better-selling shoe styles. (Edgeworth Decl. ¶ 45-51, Ex. 9.)

Defendants' conduct threatens irreparable injury not only to pediped's brand (Edgeworth Decl. ¶¶ 68-74) but also to businesses that sell pediped's shoes (Decl. of David Taylor ¶¶ 8-10; Decl. of Jinae Kang ¶ 10). In response to this imminent threat, pediped filed this action against J&L on April 14, 2008. J&L responded to pediped's counsel through Canadian counsel, but otherwise has not filed an appearance in this case. The parties have been unable to resolve this matter. On May 23, 2008, pediped amended its complaint to include J&L's owner and President, Buell, in his individual capacity. Pediped now applies to this court for preliminary relief and leave to conduct expedited discovery in order to protect its brand from potential destruction.

## III.    PEDIPED SATISFIES THE SECOND CIRCUIT'S *JACKSON DAIRY* STANDARD FOR A PRELIMINARY INJUNCTION.

Under the Second Circuit's standard for preliminary injunctive relief, pediped will demonstrate: "(a) irreparable harm and (b) either (1) likelihood of success on the merits *or* (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Jackson Dairy, Inc. v. H.P. Hood & Sons*, 596 F.2d 70, 72 (2d Cir. 1979); *see also Fun-Damental Too, Ltd. v. Gemmy Indus. Corp.*, 111 F.3d 993, 998-99 (2d Cir. 1997) (applying *Jackson Dairy* standard in affirming preliminary injunction in action for trade dress infringement).

### A.    Pediped Is Likely to Succeed on Its Trade Dress Infringement Claims (Counts I and V).

Pediped is likely to succeed in showing that Defendants' acts constitute trade dress infringement under the Lanham Act and New York common law. *See Cartier, Inc. v. Four Star Jewelry Creations, Inc.*, No. 01 Civ 11295, 2003 U.S. Dist. LEXIS 7844, at *21 (S.D.N.Y. May

8, 2003) (noting that likelihood of success on the merits means only a better than fifty percent chance of prevailing). Under § 43(a) of the Lanham Act, pediped will be able to prove (1) that its trade dress is distinctive as to the source of its footwear, (2) that there is a likelihood of confusion between pediped's and Defendants' footwear, and (3) that pediped's trade dress is nonfunctional. *Cartier, Inc. v. Four Star Jewelry Creations, Inc.*, 348 F. Supp. 2d 217, 240-41 (S.D.N.Y. 2004); *see also Fun-Damental Too, Ltd.*, 111 F.3d at 999 (2d Cir. 1997) (stating elements of claim).

On the claim under New York common law, pediped's burden is even less: secondary meaning need not be proved. Otherwise, the elements are essentially the same as its claim for trade dress infringement under § 43(a) of the Lanham Act. *See Eliya, Inc. v. Kohl's Dep't Stores*, No. 06 Civ 195 (GEL), 2006 U.S. Dist. LEXIS 66637 (S.D.N.Y. Sept. 13, 2006); *Cartier, Inc. v. Four Star Jewelry Creations, Inc.*, No. 01 Civ 11295, 2003 U.S. Dist. LEXIS 7844, at *39 (S.D.N.Y. May 8, 2003). The discussion below treats the federal and New York claims uniformly except as to the first element, distinctiveness.

### 1.    Pediped's Trade Dress Is Distinctive as to the Source of its Footwear.

The decision in *Wal-Mart Stores, Inc. v. Samara Bros.*, 529 U.S. 205, 209 (2000), recognizes two categories of trade dress: product packaging and product design. That case establishes that a party seeking to protect the design of its product as trade dress under § 43(a) of the Lanham Act must show secondary meaning in that design. *Id.* at 216. Product packaging, however, may be inherently distinctive and thus protected under § 43(a) of the Lanham Act without proof of secondary meaning. *Id.* at 215.

On this point federal law diverges from New York law on trade dress: "Under New York common law . . . there is no requirement to show secondary meaning for distinctive designs." *Cartier, Inc. v.*, 2003 U.S. Dist. LEXIS 7844, at *39; *see also Ideal Toy Corp. v. Chinese Arts &*

6

*Crafts Inc.*, 530 F. Supp. 375, 379 (S.D.N.Y. 1981) ("Under New York law, even if plaintiff does not show secondary meaning, it is sufficient to sustain the issuance of an injunction that plaintiff show that the trade dress of a second comer is confusingly similar to its own.")

In this case, pediped's trade dress embraces both the design and the packaging of its product. (Edgeworth Decl. ¶¶ 6-15.) Pediped will prove that the design of its shoes is distinctive enough to become recognized as a mark of quality, entitling it to protection under New York common law, and also has acquired secondary meaning and is actionable under the Lanham Act. Pediped also will prove that the packaging of its product is inherently distinctive, entitling it to protection under both federal and New York law, and that in any event, it too has acquired secondary meaning.

> **a.    *Both the Design and the Packaging of Pediped's Shoes Have Acquired Secondary Meaning.***

The trade dress of pediped's product, which includes elements of the design and the packaging of its Originals line of children's footwear, has acquired secondary meaning. Trade dress, like any mark, acquires secondary meaning when it comes to signify to the consuming public not just a product but also its producer. *See Centaur Commc'ns, Ltd v. A/S/M Commc'ns, Inc.*, 830 F.2d 1217, 1221 (2d Cir. 1987); *Cartier, Inc.*, 2003 U.S. Dist. LEXIS 7844, at *24. The party seeking protection must demonstrate secondary meaning only within "a substantial segment of the relevant group of consumers." *Centaur Commc'ns, Ltd*, 830 F.2d at 1222. In this case, a substantial segment of U.S. consumers of infant footwear understands that the design and packaging of pediped's Originals line identifies pediped as the source of the product.

The Second Circuit considers six factors in determining the existence of secondary meaning: "(1) advertising expenditures, (2) consumer studies linking the mark to a source, (3) unsolicited media coverage of the product, (4) sales success, (5) attempts to plagiarize the mark,

and, (6) length and exclusivity of the mark's use." *Centaur Commc'ns, Ltd*, 830 F.2d at 1222; *see also Cartier, Inc.*, 2003 U.S. Dist. LEXIS 7844, at *24. No one of these factors is determinative, and not every factor must be proved in order to establish secondary meaning. *Centaur Commc'ns, Ltd*, 830 F.2d at 1222.

### (1)    Pediped Has Made Substantial Advertising Expenditures.

Pediped spent over $1 million in 2007 in advertising its distinctive products. (Edgeworth Decl. ¶ 30.) In 2008, advertising expenditures are expected to reach at least $1.7 million. (Edgeworth Decl. ¶ 30.) Pediped advertises its distinctive footwear and packaging in consumer and industry magazines, including "Reader's Digest," "Parenting," "People," "US Weekly," "Baby Talk," "Working Mother," "Junior," "Wonder Time," "Cookie," "Earnshaw's," "American Baby," "Latina" and "Parents." (Edgeworth Decl. ¶ 26, Ex. 6.) Pediped also advertises its shoes on the pediped.com website, which has had over 325,000 unique visitors this year alone. (Edgeworth Decl. ¶ 28.)

In addition, pediped has promoted its distinctive footwear and packaging at numerous trade shows, including, among others, MAGIC, the WSA Show, ENK International's Children's trade show, the ABC Kids Expo, and the California Gift Show. (Edgeworth Decl. ¶ 29.) This factor favors pediped.

### (2)    Consumer Studies.

The threat of irreparable harm to pediped in this case is so imminent that pediped has applied for preliminary relief without having commissioned consumer studies regarding secondary meaning in its trade dress. Evidence in the form of consumer studies is not essential to pediped's claim. *See Cartier, Inc.*, 2003 U.S. Dist. LEXIS 7844, at *25 (finding secondary meaning where evidence of consumer studies was not introduced).

8

There is, however, ample anecdotal evidence that consumers across the country have come to recognize pediped's distinctive shoes by their particular design and packaging. (Edgeworth Decl. ¶¶ 35-38.)  Whenever a celebrity is photographed with his or her child wearing pediped shoes, pediped receives numerous emails and phone calls from people pointing out that the celebrity child is sporting pediped shoes. (Edgeworth Decl. ¶ 36.)  These consumers must be recognizing pediped's shoes solely by their distinctive design because, other than a small tag on the side of the shoe with pediped's bear logo, the pediped name and mark are not featured anywhere on the outside of pediped's footwear. (Edgeworth Decl. ¶ 36.)  In addition, customers regularly compliment pediped on the unique packaging and style of its shoes. (Edgeworth Decl. ¶¶ 37-38.)  This factor favors pediped.

### (3)    Pediped Has Enjoyed Phenomenal Sales Success.

Pediped is one of the fastest growing children's footwear companies in the United States. (Edgeworth Decl. ¶ 4.)  At the end of 2005, pediped was selling into 350 stores.  (Edgeworth Decl. ¶ 4.)  That number had increased to 1,200 stores at the end of 2006 and about 2,500 at the end of 2007.  (Edgeworth Decl. ¶ 4.)  Pediped footwear has been sold through more than 3,000 stores worldwide. (Edgeworth Decl. ¶ 4.)

Sales of pediped shoes have been beyond expectations.  (Edgeworth Decl. ¶ 33.)  In 2005, total revenues were approximately $300,000. (Edgeworth Decl. ¶ 33.)  In 2006, sales grew to over $2.2 million.  Pediped's growth continued in 2007, with total sales of over $7.6 million. (Edgeworth Decl. ¶ 33.)  Sales for 2008 are projected at $16 – 20 million, and $50 million by 2010. (Edgeworth Decl. ¶ 33.)  This factor favors pediped.

### (4)    Pediped's Footwear Has Been the Subject of Unsolicited Media Coverage.

Pediped footwear and its distinctive packaging is regularly featured in the media, including in publications like *Parenting, Earnshaw's, Pregnancy, Newborn, Fit Pregnancy, Parents, Chicago Baby, Find it!, Brava, Style, Country Living, Mom & Baby, Parents & Children, New Parent, Baby Talk, Wondertime, Child, Bundle, Los Angeles Magazine, New Parent, Baby Couture, Preemie,* and others (Edgeworth Decl. ¶ 25, Ex. 4); on television programs like *Extreme Makeover Home Edition,* the *CBS Early Show,* and *Access Hollywood* (Edgeworth Decl. ¶ 25); and in websites and blogs like "Celebritybaby.com," "Totsnob.com," "Classymommy.com," "Celebritycafe.com," "Babble.com," "WSAToday.com," "Mothergoosemouse.com," and "Mommieswithstyle.com." (Edgeworth Decl. ¶ 25, Ex. 4). Pediped receives unsolicited media coverage when the children of celebrities are photographed wearing pediped shoes. (Edgeworth Decl. ¶ 35-36.)

In highlighting pediped's new line of rubber-soled shoes, *Earnshaw's,* a leading trade publication for the children's market, specifically referenced pediped's distinctive look: "The new styles for older children will be consistent with Pediped's signature design." (Edgeworth Decl. ¶ 25, Ex. 5.) Beyond mere coverage, pediped has received awards from the media. In 2005, pediped won an "Earnie Award" for most innovative new brand from *Earnshaw's.* (Edgeworth Decl. ¶ 17.) In 2007, pediped won the "Earnie Award" for Best Children's Footwear. (Edgeworth Decl. ¶ 18.) *Consumer Reports* recognized pediped shoes in their 2007 Best Baby Products guide as one of the top recommendations for flexible children's footwear. (Edgeworth Decl. ¶ 21.) This factor favors pediped.

10

### (5)    Competitors Have Attempted to Plagiarize Pediped's Trade Dress.

Trying to free ride on pediped's distinctive designs, other competitors have copied pediped's shoes. (Edgeworth Decl. ¶ 34.) Stride Rite came out with a "Lucy Sykes Ethan" shoe that was highly similar to pediped's shoe #272. (Edgeworth Decl. ¶ 34.) Through counsel, pediped sent Stride Rite a demand letter, and it discontinued the shoe. (Edgeworth Decl. ¶ 34.) Similarly, sellers of Defendants' shoes have touted them as "similar to pediped's." (Edgeworth Decl. ¶ 58, Ex. 21.) This factor favors pediped.

### (6)    Pediped Has Used Its Trade Dress Exclusively for a Significant Time.

Since early 2006, pediped continuously has marketed and sold the specific overall design of children's footwear embodying and packaged in the trade dress at issue. (Edgeworth Decl. ¶ 6.) Apart from Defendants' product at issue, pediped is and has been the only source of children's footwear featuring the combination of design and packaging elements that constitutes pediped's trade dress (Edgeworth Decl. ¶¶ 6-15.) In the two years that pediped's trade dress has been on the market, pediped's sales have grown rapidly. Part III.A.1.a.(1) *supra*. Pediped also greatly increased its advertising expenditures during this period. Part III.A.1.a.(1) *supra*. Moreover, pediped has taken measures to preserve its exclusivity with respect to use of the trade dress at issue. Part III.A.1.a.(6) *supra*.

Two years of exclusive use in these circumstances is more than sufficient time for pediped to have achieved secondary meaning in its trade dress: "due to the 'mass exposure achievable with today's communications media,' public demand for a particular product and concomitant secondary meaning can be 'rapidly achieved,'... in a matter of months." *Eliya, Inc.*, 2006 U.S. Dist. LEXIS 66637, at *17 (quoting *L.A. Gear, Inc. v. Thom McAn Shoe Co.*, 988 F.2d 1117, 1130 (Fed. Cir. 1993)). This factor favors pediped.

**b.    The Packaging of Pediped's Shoes Is Inherently Distinctive.**

The packaging of pediped's Originals line is arbitrary/fanciful, or at least suggestive, which entitles it to protection even in the absence of secondary meaning. The Second Circuit applies to trade dress the same test for inherent distinctiveness that it applies to other marks: "trade dress is classified on a spectrum of increasing distinctiveness as generic, descriptive, suggestive, or arbitrary/fanciful. Suggestive and arbitrary or fanciful trade dress are deemed inherently distinctive and thus always satisfy the first prong of the test for protection." *Fun-Damental Too, Ltd.*, 111 F.3d at 1000. Because of the practically limitless options a producer has for packaging its product, that packaging "typically will be arbitrary or fanciful and meet the inherently distinctive requirement." *Id.*; *see also Fruit-Ices Corp. v. CoolBrands Int'l Inc.*, 335 F. Supp. 2d 412, 419 (S.D.N.Y. 2004).

Even where features of packaging claimed as protected trade dress are common within an industry or the general marketplace, the aggregate of these features often achieves inherent distinctiveness, because "it is the combination of elements and the total impression that the dress gives to the observer that should be the focus of a court's analysis of distinctiveness. If the overall dress is arbitrary, fanciful, or suggestive, it is inherently distinctive despite its incorporation of generic or descriptive elements." *Fruit-Ices Corp.*, 335 F. Supp. 2d at 419 (quoting *Paddington Corp. v. Attiki Imps. & Distribs., Inc.*, 996 F.2d 577, 584 (2d Cir. 1993)) (alteration in original). *See also Fun-Damental Too, Ltd.*, 111 F.3d at 1001 ("Although some of the individual elements of a trade dress are generic or descriptive, the impression given by all of them in combination may be inherently distinctive.").

The combination of elements that give a total impression of pediped's packaging for its shoes is arbitrary and fanciful, or at least suggestive. The shoes are packaged in a sturdy, purple, and textured box with a clear plastic window through which the shoes can be viewed.

(Edgeworth Decl. ¶ 15, Ex. 2.)  The pediped logo and tag line are situated above the plastic window, with the tag line printed in smaller font. (Edgeworth Decl. ¶ 15, Ex. 2.)  A description of the product is positioned at the bottom of the box, below the window. (Edgeworth Decl. ¶ 15, Ex. 2.)  The left and right sides of the box surrounding the window are of equal proportion to each other and the top portion of the box surrounding the window is more than twice the length of the bottom portion of the box surrounding the window. (Edgeworth Decl. ¶ 15, Ex. 2.)  This combination of elements is unique in the children's footwear industry. (Edgeworth Decl. ¶ 15.) It is plain that pediped's packaging cannot be characterized as descriptive or generic and consequently is inherently distinctive.

### c.    *The Design of Pediped's Shoes Is Sufficiently Distinctive to Become Recognized as a Mark of Quality.*

As discussed previously, under New York law, even if plaintiff does not show secondary meaning, "it is sufficient to sustain the issuance of an injunction that plaintiff show that the trade dress of a second comer is confusingly similar to its own." *Ideal Toy Corp.*, 530 F. Supp. at 379 (quoting *Commerce Foods, Inc. v. PLC Commerce Corp.*, 504 F. Supp. 190 (S.D.N.Y. 1980)) (citation and quotation marks omitted); *see also Cartier, Inc. v.*, 2003 U.S. Dist. LEXIS 7844, at *39 (citing *Ideal Toy Corp.* and *Commerce Foods, Inc.* more than three years after *Wal-Mart Stores, Inc. v. Samara Bros.* announced that a showing of secondary meaning is essential for product design trade dress claims under § 43(a) of the Lanham Act).

As set forth more fully in Part II.A *supra*, the design of pediped's shoes is more than distinctive enough to become recognized as a mark of quality.  Pediped's design elements are capable of becoming recognized as a mark of quality, and as shown in Part III.A.1.a *supra*, they already have become so recognized.

### 2.    There Is a Likelihood of Confusion Between Pediped's and Defendants' Footwear.

The Second Circuit considers eight factors for determining likelihood of confusion: (1) the strength of the mark; (2) the degree of similarity between the two marks; (3) the proximity of the products; (4) the likelihood that the prior owner will "bridge the gap;" (5) actual confusion; (6) the defendant's good faith in adopting its mark; (7) the quality of the defendant's product, and (8) the sophistication of the buyers. *Polaroid Corp. v. Polarad Elec. Corp.*, 287 F.2d 492, 495 (2d Cir. 1961).

#### a.    *Pediped's Trade Dress Is Strong.*

The strength of particular trade dress is its power to identify the source of the product at issue. *See Cartier, Inc.*, 2003 U.S. Dist. LEXIS 7844, at *28. The relevant considerations are where the trade dress falls on the spectrum of distinctiveness and the same facts that are probative of secondary meaning. *See Fruit-Ices Corp.*, 335 F. Supp. 2d at 423 (equating trade dress strength with distinctiveness and secondary meaning); *Cartier, Inc.*, 2003 U.S. Dist. LEXIS 7844, at *30 ("The court believes that its discussion above concerning the secondary meaning of the relevant products is dispositive of this factor in the *Polaroid* analysis.") Thus, Part III.A.1 *supra* establishes that this factor favors pediped.

#### b.    *Defendants' Trade Dress Is Highly Similar, If Not Identical, to Pediped's Trade Dress.*

In determining the similarity between the parties' trade dresses, a court should consider the overall look of the products and the specific elements that produce those overall looks. *Fruit-Ices Corp.*, 335 F. Supp. 2d at 424. The context in which the parties marks are found also should be considered in gauging their similarity. *Aedes de Venustas v. Venustas Int'l, LLC*, No. 07 Civ. 4530 (LTS) (THK), 2007 U.S. Dist. LEXIS 66586, at *9-10 (S.D.N.Y. Sept. 11, 2007).

The overall similarities between the parties' shoes are recounted in Part II *supra*. Defendants also copied pediped's better-selling styles in particular, using the same colors and design features. Defendants' style number 181 shoe is a replica of pediped's Samantha shoe. (Edgeworth Decl. ¶ 46, Ex. 10.)  The 181 shoe duplicates pediped's Samantha color combinations (pink and brown) and color shades, and features these colors in the very same locations as on the Samantha shoe. (Edgeworth Decl. ¶ 46, Ex. 10.) The 181 shoe also makes use of pediped's double white stitch on the upper portion of the shoe, with circular cut-outs in between the stitches showing off the underlying pink leather. (Edgeworth Decl. ¶ 46, Ex. 10.) The 181 features pediped's unique scalloping found in several of its other designs (e.g., the Katelyn and Zoe styles). (Edgeworth Decl. ¶ 46, Ex. 10.)

Defendants' style number 412 shoe is an imitation of pediped's Olivia shoe. (Edgeworth Decl. ¶ 47, Ex. 11.) From the white leather and placement of the white bow to the six cut-out designs in identical locations on the upper portion of the shoe, everything is copied from pediped's shoe. (Edgeworth Decl. ¶ 47, Ex. 11.) The 412 also features pediped's scalloped edging found on its other designs, as well as the same dimensions and proportions, type of strap, distinctive white stitching on black sole and stylized rippling found across pediped's shoes. (Edgeworth Decl. ¶ 47, Ex. 11.) The 412 features cut-outs on the back of the shoe, which are taken from some of pediped's other shoes (e.g., Katelyn and Colin styles). (Edgeworth Decl. ¶ 47, Ex. 11.)

Defendants' style number 411 shoe is a knock-off of pediped's Katelyn shoe. (Edgeworth Decl. ¶ 48, Ex. 12.) The pink leather, scalloped edging and cut-outs on the front and back of the upper portion of the shoe are all taken from the Katelyn style. (Edgeworth Decl. ¶ 48, Ex. 12.)  The placement of the bow on 411 is identical to the placement on many of

pediped's other styles. (Edgeworth Decl. ¶ 48, Ex. 12.) The 411 again uses the same dimensions and proportions, type of strap, distinctive white stitching and stylized rippling found across pediped's shoes. (Edgeworth Decl. ¶ 48, Ex. 12.)

Defendants' style number 402 shoe is pediped's boy's Colin shoe with only the subtlest of changes. (Edgeworth Decl. ¶ 49, Ex. 13.) The front upper portion of the shoe features similar vertical stitching, the same strap and t-strap loop, as well as the same u-shaped cut-outs near the strap and additional cut-outs along the sides and back. (Edgeworth Decl. ¶ 49, Ex. 13.) Again, the 402 copies the same dimensions and proportions, stylized rippling and distinctive white stitching on black sole found across pediped's shoes. (Edgeworth Decl. ¶ 49, Ex. 13.)

Defendants' style number 171 shoe is a copy of pediped's Abigail design. (Edgeworth Decl. ¶ 50, Ex. 14.) From using pink leather and similar flower artwork on the upper front of the shoe, to using the same dimensions and proportions, strap, stylized rippling and distinctive white stitching on black sole found across pediped's shoes, the 171 has the same look and feel as pediped's Abigail. (Edgeworth Decl. ¶ 50, Ex. 14.) In addition, the 171 copies the scalloping featured on pediped's other designs and features a sewn-in tag on the strap of the shoe (as does most of pediped's soft-soled shoes). (Edgeworth Decl. ¶ 50, Ex. 14.)

Defendants' style numbers 251 and 252 shoes are direct copies of pediped's boy's Tyler shoe. (Edgeworth Decl. ¶ 51, Ex. 15.) The 251 and 252 are identical in nearly every respect, including overall look, shape, style and two choices of leather color (brown or navy). (Edgeworth Decl. ¶ 51, Ex. 15.) The only minimal difference is the stitching pattern on the lower front of the upper portion of the shoe. (Edgeworth Decl. ¶ 51, Ex. 15.) These shoes also make use of the same dimensions and proportions, stylized rippling, strap and distinctive white stitching on black soles found across pediped's shoes. (Edgeworth Decl. ¶ 51, Ex. 15.)

16

Most telling, third parties selling Defendants' shoes are marketing the shoes as copies of pediped's shoes. One eBay seller's listing states: *"These are awesome shoes and will sell out quickly!! Similar to Pedipeds, these are a must for this spring."* (Edgeworth Decl. ¶ 58, Ex. 21.)

In view of the overwhelming similarities between Defendants' new line of shoes and pediped's shoes, both overall and in regard to particular shoe styles, this factor favors pediped.

### c.    *Defendants' Footwear Is in Direct Competition with Pediped's Footwear.*

The proximity of the products is relevant to the likelihood of confusion because consumers are more likely to believe that the parties' products originate from the same source the closer the second user's products are to those of the first user. *Aedes de Venustas*, 2007 U.S. Dist. LEXIS 66586, at *11-12. The products at issue here are directly competitive. Defendants' new line is available in the same sizes and at  the same price points as pediped's shoes. (Edgeworth Decl. ¶ 55, Ex. 18.) Defendants also sell their existing line through close to 1000 of the same retailers that sell pediped's shoes. (Edgeworth Decl. ¶ 60.) In view of the products being in direct competition and sold through the same channels of trade, this factor favors pediped.

### d.    *There Is No Gap to Bridge.*

As discussed above, the products already are directly competitive, so there is no gap to bridge. This factor favors pediped.

### e.    *Actual Confusion Is Likely to Increase Unless Defendants Are Enjoined.*

Pediped is not required to show actual confusion to succeed on its claims. *GMA Accessories, Inc. v. Bop, LLC*, 507 F. Supp. 2d 361, 364 (S.D.N.Y. 2007) *vacated on other grounds*, 2008 U.S. Dist. LEXIS 26120 (S.D.N.Y. Mar. 20, 2008); *Cartier, Inc.*, 2003 U.S. Dist. LEXIS 7844, at *36. Given the very recent release into the U.S. market by Defendants' products

at issue, it would be remarkable if much actual confusion were already occurring. Nevertheless, the response of attendees of the ENK Children's Club show on March 11, 2008, several of whom characterized Defendants' new line as a rip-off of pediped and one of whom inquired whether pediped owned J&L (Edgeworth Decl. ¶ 39), coupled with the comments of sellers in referring to Defendants' knockoffs as similar to pediped's shoes, indicates that actual confusion is likely to increase unless a preliminary injunction is granted. This factor favors pediped.

### f.    *Defendants' Bad Faith Intent to Trade on Pediped's Goodwill Is Plain from Their Slavishly Copied Designs.*

Although direct evidence of Defendants' true intent is uniquely within their own control, the striking similarity between certain of Defendants' and pediped's designs solidly supports the inference that Defendants deliberately copied pediped's footwear in order to take a free ride on its reputation. In a similar case, the court made such an inference on the basis of similarities in product design and packaging between plaintiff's and defendants' cube puzzles, stating that the similarities strongly indicated "that defendants' products and packaging were intentionally made similar to plaintiff's to capitalize on the appearance of plaintiff's product." *Ideal Toy Corp.*, 530 F. Supp. at 378. The court stated that "[o]ne need only look at the cubes sold by each of the defendants . . . to understand the almost inevitable confusion that would be created in the mind of an average consumer confronted with defendants' products." *Id. See also Samara Bros. v. Wal-Mart Stores, Inc.*, 165 F.3d 120, 127-28 (2d Cir. 1998), *rev'd on other grounds*, 529 U.S. 205 (2000) (finding intent to deceive where the defendant sold numerous garments practically identical to the plaintiff's clothes); *Oral-B Labs., Inc. v. Mi-Lor Corp*, 810 F.2d 20, 23 (2d Cir. 1987) (finding a likelihood of confusion between plaintiff's and defendant's packaging based largely on defendant's purposeful evocation of plaintiff's product).

A simple comparison of certain of Defendants' designs with the pediped designs from which they were obviously copied (Edgeworth Decl. Ex. 9) is powerful evidence of Defendants' bad faith intent to trade on pediped's goodwill. This factor favors pediped.

### g.    *Pediped's Footwear Is of Higher Quality Than Defendants'.*

The quality of a defendant's product can bear on the likelihood of confusion in at least two ways: an inferior quality product injures the senior user's reputation because people may think both products come from the same source, and a product of equal quality promotes confusion that both products come from the same source because of the similarity. *Aedes de Venustas*, 2007 U.S. Dist. LEXIS 66586, at *18; *Cartier, Inc.*, 348 F. Supp. 2d at 247.

Pediped's footwear is of higher quality than Defendants'. Pediped's leather is called top grain, the best that money can buy. (Edgeworth Decl. ¶ 5.) Defendants, however, use belly or second layer leather, which is inferior. (Edgeworth Decl. ¶ 67.) On some of Defendants' shoes, the leather has delaminated from the pig skin lining. (Edgeworth Decl. ¶ 67.) In addition, Defendants' shoes are inferior to pediped's in several other respects, including using a lower grade of Velcro; packaging the shoes in shallower boxes, which allow the shoes to be crushed in transit; and stitching poorly on the bottom of the shoes and the tag. (Edgeworth Decl. ¶¶ 62-66.) Although Defendants' shoes appear nearly identical to pediped's shoes at first blush (Edgeworth Decl. ¶ 61), once discovered, the difference in quality will greatly and irreparably harm pediped's goodwill and reputation with consumers who have mistaken Defendants' shoes for pediped's. This factor favors pediped.

### h.    *Pediped's Footwear Is Not So Costly That Consumers Will Exercise Great Care in Making Purchases.*

In cases like this, "where there is a high degree of similarity between the goods, consumer sophistication is not a significant factor." *GMA Accessories, Inc.*, 507 F. Supp. 2d at

364. Even so, this factor supports a likelihood of confusion on these facts. Although pediped's shoes are of extremely high quality and have achieved considerable prestige, they are not so expensive that consumers are likely to use a high degree of care in making purchasing decisions. Pediped shoes retail for $29 to $31. (Edgeworth Decl. ¶ 32.) Defendants' product at issue sells for $30 on Defendants' web site. (Edgeworth Decl. ¶ 55, Ex. 18.) These are not price points that command a high degree of scrutiny from most consumers. This factor favors pediped.

### 3.    Pediped's Trade Dress Is Nonfunctional.

Pediped will show that its trade dress is not functional and is thus protectable. Functional trade dress is essential to the use or purpose of the product or affects the cost or quality of the product. *Cartier, Inc.*, 2003 U.S. Dist. LEXIS 7844, at *37-38. While ornamental trade dress can be aesthetically functional if granting one party exclusive use of it would disadvantage competitors significantly for reasons unrelated to reputation, *id.* at 38, unless use of all the elements that in combination form a particular trade dress, including utilitarian and ornamental elements, is essential to effective competition in a particular market, the trade dress is nonfunctional. *See Fruit-Ices Corp.*, 335 F. Supp. 2d at 422.

Pediped's trade dress (Edgeworth Decl. ¶¶ 6-15) is a nonfunctional configuration or combination of specific design elements of pediped's footwear and packaging. Although in describing its trade dress, pediped must reference elements of its footwear that are no doubt functional, such as shoes having soles, stitching, toes, and straps, it obviously is not seeking a monopoly in all shoes with soles, stitching, toes, and straps but rather is seeking to protect the specific type of soles, stitching, toes, and straps that, along with various nonfunctional design elements, characterize its Originals line.

The discussion of functionality in *Eliya, Inc. v. Kohl's Department Stores*, No. 06 Civ 195 (GEL), 2006 U.S. Dist. LEXIS 66637, at *12-13 (S.D.N.Y. Sept. 13, 2006), a case involving

an overall shoe design, is instructive.  In that case, the plaintiff did not claim that any one particular feature of the shoe design was protectable trade dress.  Rather, the plaintiff listed a number of features that, taken together, comprised the overall image of the shoe design. The court rejected the defendant's claim that the strap, stitching, or sole were functional features under the Lanham Act, reasoning that "every shoe needs some form of stitching and some form of sole, and many shoes have some form of strap."  The court focused on the fact the plaintiff was not asserting that its trade dress is the mere fact that the shoe design incorporated a strap, stitching, or a sole, but rather, that the particular *design* of the stitching, the sole, and the strap on its shoe design comprised the design's overall image and was protectable as trade dress.  *See also Cartier, Inc.*, 2003 U.S. Dist. LEXIS 7844, at *17 ("The fact that [defendant's expert] agreed that a bar on manufacturing a watch with a combination of features composing Cartier's trade dress as a whole would not seriously limit his options as a watch designer further substantiates the view that the designs are nonfunctional.")

The alternative designs, colors, features, and combinations that Defendants could have chosen for their product line are endless. (Edgeworth Decl. ¶ 52.)  A simple review of other competitors' shoes and packaging in the marketplace demonstrates that there are numerous combinations dissimilar to pediped's trade dress from which one can create commercially viable, appealing lines of shoes. (Edgeworth Decl. ¶ 52, Ex. 16.)

The fact that pediped's trade dress is nonfunctional is borne out by Defendants' ability to compete effectively in the market with a line of footwear that does not incorporate pediped's trade dress. (Edgeworth Decl. ¶ 53, Ex. 17.)  *See Fruit-Ices Corp.*, 335 F. Supp. 2d at 423 (citing defendant's dissimilar trade dress on a separate product as evidence that plaintiff's trade dress is nonfunctional).  In view of these considerations, pediped's trade dress is nonfunctional.

21

**B.**    **Defendants' Acts Will Irreparably Harm Pediped Unless Preliminarily Enjoined.**

Preliminary injunctive relief is warranted where, as here, the nature of the potential damage is such that it cannot be remedied if allowed to occur: "The purpose of a preliminary injunction is to prevent irreparable injury and preserve a court's ability to render a meaningful decision on the merits." *Cartier, Inc.*, 2003 U.S. Dist. LEXIS 7844, at *39. Much of the harm that results from trade dress infringement, such as loss of a good reputation with consumers, is irreparable by nature due to the difficulty of measuring the value of goodwill represented by plaintiff's trade dress. "Confusion itself results in loss of goodwill because consumers would likely mistake defendants' potentially inferior goods for those of plaintiff." *Ideal Toy Corp.*, 530 F. Supp. at 380-81 (quoting *Miller Brewing Co. v. Carling O'Keefe Breweries of Canada, Ltd.*, 452 F. Supp. 429, 437-38 (W.D.N.Y. 1978)). In actions for trade dress infringement, irreparable harm is presumed from a sufficient showing of likelihood of confusion. *Cartier, Inc.*, 2003 U.S. Dist. LEXIS 7844, at *43-44; *see also Fun-Damental Too, Ltd.*, 111 F.3d at 99.

Here, not only is harm presumed as a matter of law, but it is also evidenced through specific facts. First, Defendants' wrongful acts give them an unfair competitive advantage that could destroy pediped's brand. (Edgeworth Decl. ¶¶ 69-70.) Since Defendants are taking a free ride on pediped's extensive advertising and have slavishly copied pediped's designs, Defendants do not have the advertising or research and development costs that pediped incurs. (Edgeworth Decl. ¶ 69.) Thus, Defendants would be able to undercut pediped's pricing and still profit. (Edgeworth Decl. ¶ 70.) If Defendants are permitted to get a foothold in the market and confuse customers, they could then switch to cheaper materials to undercut pediped's price by an even greater degree. (Edgeworth Decl. ¶ 70; Taylor Decl. ¶¶ 8-10.) Although consumers would be

disappointed in the quality, these tactics could put pediped out of business. (Edgeworth Decl. ¶ 70.)

Second, Defendants permit just about anyone to sell its shoes, including retailers who likely sell only online. (Edgeworth Decl. ¶ 71.) Pediped, on the other hand, is enormously protective of its brand and is extremely selective with respect to the persons and companies authorized to sell its shoes. (Edgeworth Decl. ¶ 71.) Defendants' indiscriminate placement of its new line of shoes will cheapen pediped's image when consumers mistakenly believe that pediped no longer sells exclusively through high-end retailers. (Edgeworth Decl. ¶ 71.) Such damage to the prestige of pediped's brand is irreparable.

Third, some of Defendants' shoes incorporate unsophisticated and tacky elements (e.g. pirates, anchors, the word "prince"). (Edgeworth Decl. ¶ 72; Decl. of Kimberly A. Berry ¶ 12.) Given the confusing similarity between pediped's shoes and Defendants' new line, these unsophisticated and tacky elements could cause consumers to believe erroneously that pediped has abandoned its unique, high-end, and sophisticated signature look. (Edgeworth Decl. ¶ 72.) This damage too would be irreparable.

Fourth, pediped believes that Defendants pay their sales representatives a higher percentage than is common in the industry and than pediped can afford to pay because of their savings from wrongfully using pediped's intellectual property. (Edgeworth Decl. ¶ 73.) Thus, Defendants' sales reps have an incentive to push Defendants' product to the same retailers who sell pediped's product. (Edgeworth Decl. ¶ 73.) This could result in an irreparable loss of pediped's market share.

Finally, the quality issues discussed in Part III.A.2.g *supra* threaten to irreparably harm pediped in obvious ways. Pediped and its retailers have many repeat customers. (Kang Decl. ¶

6; Berry Decl. ¶ 11.)  Consumers who mistake Defendants' shoes for pediped's may stop buying

pediped's shoes.  (Edgeworth Decl. ¶¶ 61-67; Kang Decl. ¶ 10.)  Loss of repeat business is

another irreparable injury pediped will suffer in the absence of preliminary injunctive relief.

### C.    Pediped Has Shown Serious Questions Going to the Merits and a Balance of Hardships Tipping Decidedly Toward It.

Pediped submits that it has shown a likelihood of success on the merits and, at the very

least, sufficiently serious questions going to the merits to make them a fair ground for litigation.

Pediped is entitled to preliminary injunctive relief because the balance of hardships tips

decidedly toward it. *Fun-Damental Too, Ltd.*, 111 F.3d at 998-99.

The present facts are similar to those in *Ideal Toy Corp. v. Chinese Arts & Crafts Inc.*,

530 F. Supp. 375, 380 (S.D.N.Y. 1981), where the court found that the balance of hardships

tipped decidedly toward the plaintiff:

> Plaintiff clearly has the most at stake in this litigation.  Of the parties involved, it
> was the first to market the cube puzzle at issue. . . . Some of the defendants . . .
> show a wider variety of cubes available to them.  In addition, defendants are
> relative newcomers in the market and, in the view of this court, would not suffer
> the hardships from an injunction that would attend the plaintiff if the injunction is
> denied.

*See also Cartier, Inc.*, 2003 U.S. Dist. LEXIS 7844, at *44 ("Cartier has made a sufficient

showing that defendants' sales may cause . . . reputational losses . . . while it cannot be said that

defendants would suffer any similar harm were they to be enjoined from offering their watch for

sale.")  Here, pediped was first to market the trade dress at issue.  (Edgeworth Decl. ¶¶ 6-15.)

Also, Defendants have an established line of infant footwear that is not similar to the trade dress

at issue. (Edgeworth Decl. ¶ 53.)  Finally, Defendants' product at issue is definitely a newcomer

to the market, having been released on April 20, 2008.  (Edgeworth Decl. Ex. 22.)  In view of

these facts, pediped stands to suffer irreversible losses to its reputation, goodwill, customer base,

and market share if the injunction does not issue, while Defendants will only be delayed in

introducing an ancillary product line to its existing business if the injunction issues. Plainly, the balance of hardships tips decidedly toward pediped.

## IV.    CONCLUSION

For the foregoing reasons, pediped respectfully requests that this Court enter an Order to Show Cause why a preliminary injunction should not issue.

BAKER & HOSTETLER LLP

Dated:    New York, New York
          June 3, 2008

By: _____
    Thomas A. Canova (TC 7270)
    45 Rockefeller Plaza
    New York, NY 10111
    (212) 589-4200 – phone
    (212) 589-4201 – fax
    Attorneys for the Plaintiff
    pediped Infant Footwear, LLC