**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

PEDIPED INFANT FOOTWEAR LLC,

    Plaintiff,

v.

KUDOS LEATHERGOODS LTD d/b/a JACK AND LILY and ROBERT THOMAS BUELL, Individually,

    Defendants

08-CIV-3572 (LTS)

**DECLARATION OF ROBERT T. BUELL IN SUPPORT OF DEFENDANT'S MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR CIVIL CONTEMPT, EQUITABLE AND MONETARY SANCTIONS, AND EXPEDITED DISCOVERY**

I, Robert Buell, declare as follows:

1. I am the President of Kudos Leathergoods Ltd. (d/b/a Jack & Lily). This declaration is based upon personal knowledge. If called as a witness, I would testify competently to the facts set forth herein.

2. There are only three people that regularly work in our office and there are only two computers that can receive and send emails. My bookkeeper, who works three days per week, has one computer and my shipper, Yang Neng-Leong and I share the other. The signature box at the bottom of each email automatically generates my name and contact information when sending or responding to an email. Yang and I are the only two people that reply to emails and our policy is to use my name on all emails when communicating with customers. I am out of the office for an average of 2 to 3 hours per day and Yang responds to all emails during my absence. It was Yang that was communicating with Ms. Girouard.

3. I had explained to Yang that we were not to ship any of the 'My Shoes' collection to the United States. We have continued to ship within Canada and Overseas. In retrospect, I now realize that Yang did not fully understand my instructions, nor did he understand that the reason for giving these instructions was so we would not violate the injunction. Immediately after Pediped notified us that four pairs of 'My Shoes' had been shipped after the entering of the injunction, I spoke with Yang and, at that time, found evidence that 38 pair had been shipped. I immediately notified my lawyer, who immediately advised Pediped.

4. In order to be absolute certain of that number, Yang and I have since examined each invoice since the date of the injunction and have identified a further 42 pair that were inadvertently shipped bringing the total to 80 pair. The total wholesale value of these 80 pairs is $1,200 which represents approximately $120 in profit. Before Pediped brought this to my attention, I was unaware that any of the 'My Shoes' were shipped to the U.S. following the injunction..

5. We have now taken further steps to ensure that no additional pairs of 'My Shoes' are accidentally shipped to the United States. I have physically separated all the remaining 'My Shoes' inventory into a separate storage room apart from the main storage area. I have also spoken to Yang and explained again that no more of the 'My Shoes' are to be shipped into the United States.

6. We removed our 'My Shoes' collection from our website on June 20th and held back close to $15,000 worth of orders since. At all times I intended full to comply with the terms of the injunction. The shipment of these 80 pair of shoes was inadvertent on our part.

7. Our 'My Shoes' collection is manufactured in China. Production orders are placed by us through a purchasing agent by email. Our initial order for 'My Shoes' was placed in late 2007 for 9,312 pair. After this order was filled we received a letter dated March 11th from Pediped alleging, among other things, that Pediped was the owner of a design patent application and a utility patent application. Three days later, on March 14th, my legal counsel wrote to Pediped saying that a search had turned up no trace of the alleged pending patents and asked Pediped to provide more details. Pediped never responded. Even though I did not believe that our designs were similar to Pediped's products, and not withstanding that we had received no clarification from Pediped, I revised the design of the 'My Shoes' collection so as to avoid any dispute.

8. We placed another order on April 8th for 4,080 pair in which we asked the factory to follow our revised design; however instead of using the new design the order was manufactured using our original design for which we had to pay in advance. We volunteered this information to Pediped. Pediped now has copies of my email correspondence with my China agent which sets out my request. Of the total of 13,392 pairs of 'My Shoes' that were shipped to us by our manufacturer, fewer than 8,000 pair have been sold to the U.S. market; we have over 2,000 pair remaining in inventory. Pediped's anticipated sales for this year are $20,000,000 million or over 1,300,000 million pair. Our 8,000 pair represents approximately 0.0615% of their expected annual sales.

9. Even without a settlement with Pediped, we agreed not to place any additional orders. Even though we adamantly disagree with the claims brought forward by Pediped, we

- 3 -

have since completely changed our shoe design in an attempt to satisfy Pediped's demands. We did so in the hope that we could settle this matter and release us from further legal action. Our full line of redesigned shoes can be viewed on our website at www.jackandlily.com.

10. Even though we did not believe our designs infringed any of Pediped's rights, we entered into settlement negotiations with Pediped in order to avoid the costs of a legal dispute with a competitive giant many times our size. Expecting that Pediped was negotiating in good faith, and because we believed we could accept their terms and conditions, we did not enter a defense in the lawsuit in the U.S. which they had commenced. We had agreed in principal to all terms of the settlement but had asked if they would consider adding a paragraph that would release us from future lawsuits. They did not agree with our request and told us the offer was off the table. We told them we would be willing to sign the agreement without the release, but just before the response period was to expire, Pediped pulled the settlement agreement off the table and then moved for a default. We remain willing to sign the settlement agreement that they proposed on June 5th 2008.

11. The following is in response, to paragraph 3 of Ms. Wilcox's declaration: My Company did not intend to default as we assumed a settlement was imminent as of June 5, 2008. I believe this was a stall tactic on behalf of Pediped in order not to give us enough time to answer.

12. The following is in response, to paragraph 4 of Ms. Wilcox's declaration: We strongly disagree with the claims of misconduct, lack of candor and evasiveness brought forward by Ms. Wilcox as we have done everything in our power to resolve

- 4 -

this matter including completely changing our shoe design and halting production long before the injunction was granted.

13. The following is in response, to paragraph 5 of Ms. Wilcox's declaration: We told Pediped that as soon as a settlement agreement was signed we would stop selling the shoes from our website and explained we were holding approximately 1,000 pair to sell on line until the agreement was signed. We had to conduct business as usual until an agreement was actually signed or risk jeopardizing our business further.

14. The following is in response, to paragraph 6 of Ms. Wilcox's declaration: As stated above, we agreed to immediately to remove the shoes from our website once the settlement agreement was signed.

15. The following is in response, to paragraph 7 of Ms. Wilcox's declaration: In regards to the 4,080 pair, it was my understanding that this order had been changed to our new design, as we had requested. As soon as we understood that the order was the original design we immediately informed Pediped. We have tried at all time to be candid with Pediped. To our dismay, Pediped has regularly turned our candor against us.

16. The following is in response, to paragraph 8 of Ms. Wilcox's declaration: We willingly provided Pediped our new shoe shape, which they approved. As to our upper designs we feel this is completely irrelevant and unfair to require their approval for each and every design we produce. We adamantly disagree that our upper shoe designs are infringing upon Pediped's intellectual property. Other baby shoe companies that produce shoes displaying flowers, sport themes, appliqués or cut-outs

are, among others, www.seekairun.com, www.pedoodles.com, www.itzybitzy.com, www.robeez.com, www.bobux.com.

17. The following is in response, to paragraph 10 of Ms. Wilcox's declaration: Our new shoes have no similarity to Pediped, and we adamantly disagree with Mrs. Wilcox demands for discovery of the new line. Pediped's tactics have crippled us financially.

18. We are a small company and would like to avoid any future legal costs. We have been harassed by Pediped due to our smaller size. We have been conscientious in dealing with this matter and are very disappointed with Pediped's lack of cooperation. It has been devastating to our company in both money and time and I find Ms. Wilcox claim outrageous that we did not want to resolve this early on.

I declare under penalty of perjury under the laws of the United States of America that the forgoing is true and correct.

Executed at the offices of Kudos Leathergoods, Vancouver, British Columbia this 14th day of August 2008.

_____
Robert T. Buell